LILLIAN SLY, revived in the name of CARY JOHNSON, as Administrator, etc., *Appellee,* v. L. M. POWELL, *Appellant.*

No. 17,630.

SYLLABUS BY THE COURT.

1. MALPRACTICE—*Physician—Evidence—Expert Witnesses.* In an action against a physician and surgeon to recover damages for malpractice for failing to properly reduce a dislocation and treat an injured hand nonexpert witnesses can testify as to external appearances and manifest conditions observable by any one, but whether a surgical operation has been performed with a reasonable degree of skill, knowledge and care, and whether the patient was thereafter skillfully and properly treated, are questions of science to be established by the testimony of witnesses of special skill and experience and not by testimony of those who are without special learning and skill as to such operations and practice.

2. EVIDENCE—*Exclamations of Bodily Pain—Hearsay.* Testimony of expressions of a natural and spontaneous character, indicating present bodily pain, is competent as original evidence, but the declarations of an injured party as to his past feelings and symptoms, and which are not voluntary exclamations of present pain and suffering, are hearsay and should be rejected.

3. ——— *Declarations of Physician.* Ordinarily the declarations of a physician, who is not a party to the action and who was consulted by a patient as to an injury or ailment, are not admissible in evidence to show the physical condition of the patient.

4. INSTRUCTIONS—*Qualifications Required of Physician.* After instructing the jury correctly as to the skill, learning and care to be possessed and exercised by general practitioners, the court further instructed that a physician and surgeon who holds himself out to the world as an expert in any of the branches of medicine and surgery is required to possess and exercise a higher degree of knowledge and skill than the ordinary practitioner. *Held,* that nothing in the testimony herein warranted an instruction on the theory that appellant had held himself out as a specialist or that the degree of skill and care required of him should be higher and greater than is required of the ordinary physician and surgeon.

Appeal from Shawnee district court.   Opinion filed May 11, 1912.   Reversed.

R. W. Blair, H. A. Scandrett, B. W. Scandrett, and C. A. Magaw, for the appellant; Sol A. Wood, of counsel.

T. F. Garver, R. D. Garver, and J. B. Larimer, for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.:  This action was brought to recover damages for alleged malpractice.

Mrs. Lillian Sly suffered an injury to her finger and applied to L. M. Powell, a physician and surgeon, for treatment.   The doctor, who was attending another patient, did not reach Mrs. Sly until about two hours after the injury nor until the hand was considerably swollen.   After an examination he decided that there was a partial dislocation and also a slight fracture of the bone, and he undertook to reduce the dislocation, treating it in the usual way by placing splints and bandages on the finger.   He visited her two or three times at her home and each time examined and treated the injured finger when she complained that it was causing her great pain.   Subsequently she returned to her work as saleswoman in a store, but complained that she suffered much pain from the injury.   She called at the doctor's office a number of times and was given treatment, but frequently expressed dissatisfaction that greater progress towards recovery was not made.   In about five weeks after the injury she discontinued her visits to Doctor Powell and went to Doctor Stewart, who treated the injury from December until May, but she still complained of pain, and in the meantime she consulted a surgeon, Doctor Bowen, who reported that an operation was unnecessary.   While taking treatment from Doctor Stewart she consulted Doctor Hammond, who made a partial

examination, but advised her to return when he would place her under an anæsthetic so that a more complete examination could be made, but she did not go back again.   Shortly afterwards, and about six months after the injury, she consulted Doctor Keith, who advised her that there was still a partial dislocation. He placed her under the influence of an anæsthetic, and stated that he broke up the adhesions which had formed, reduced the dislocation, and that afterwards there was more circulation through her finger and she was able to move and bend it.   Inflammation and swelling continued, although she was under treatment with Doctor Keith for months.   Finally she went to Wichita and consulted with Doctor Basham, who advised an amputation, and on the following March he amputated her finger.

In her petition she charged, not that Doctor Powell lacked professional skill or learning, but that he carelessly and negligently failed to reduce the dislocation of the finger and failed to discover its condition, or to skillfully and properly treat it afterwards, with the result that she suffered severe and excruciating pain and that the finger and hand became permanently disabled, making it necessary to have the finger broken and redislocated and subsequently to have it amputated.   The answer of Powell was a denial of the allegations of a want of care and skill and an averment that if she had not recovered from the injury it was due to her impaired condition and to the fact that she did not follow the directions and advice given to her by himself and other physicians nor take ordinary care of herself.   A trial resulted in a verdict in favor of the plaintiff and the defendant appeals.   Since the judgment was rendered the plaintiff died, and the cause was revived in the name of the administrator of the estate.

On this appeal it is contended that incompetent testimony was received and that the evidence in the case

does not support the charges of negligence. In view
of the testimony that there was an admitted disloca-
tion of the finger in the first instance, testimony that
it was stiff and out of position when the splints and
bandages were removed and that it remained in that
condition until it was examined by Doctor Keith and
his assistant, Doctor Amis, and their testimony that
the finger was partly out of joint when they operated
on it, and that after the adhesions had been broken
and the dislocation reduced the finger became mov-
able, the circulation became better, the swelling went
down, and the finger became more natural in appear-
ance, it can not be said that there was no testimony
tending to support the allegation that appellant failed
to properly reduce the dislocation and to exercise the
skill and care required in the subsequent treatment of
the finger. The testimony as printed is quite meager
in some respects and not satisfactory in others. The
appellant is a regular practitioner who has had nine-
teen years' experience in medicine and surgery, and
had been Mrs. Sly's physician for ten years. A dis-
location of the joint of a finger, it is conceded, is
easily discoverable by an ordinary examination. Ap-
pellant made an examination and says that he found
the finger out of joint, that he set it, and when he did
so he noticed a distinct crepitus and the sound heard
when the dislocated joint is brought back to its nat-
ural position. He states that in subsequent examina-
tions he found the finger in proper position and mov-
able but that it caused Mrs. Sly pain, and that she did
not move or use it as much as she should have done.
He examined and dressed it a number of times during
the month following the injury and if out of place it
should have been manifest. Becoming dissatisfied she
changed physicians, and was under the charge of
Doctor Stewart for more than four months. He tes-
tified that a careful examination disclosed that the

finger was not out of joint at that time nor was it fractured; that there was little voluntary motion of the knuckle but that he could move it, although it caused her pain. The tendons at the joint indicated that there had been a dislocation, but his diagnosis was that she was then suffering with a kind of neuritis or inflammation of the nerves that supplied the finger. He is a reputable physician and surgeon of much experience, and it seems strange that he and his assistant who treated the finger did not discover a dislocation if one existed.

While under the care of Doctor Stewart she visited Doctor Hammond, who made a partial examination and found the knuckle swollen, but he stated that it was slightly movable and that there was no dislocation. There was also the examination by Doctor Bowen, who was not a witness, but he made a report to Doctor Stewart and Stewart told Mrs. Sly that Bowen agreed with him as to the condition of the finger and therefore the same treatment would be continued. All the medical testimony as to the condition of the finger from the time of the injury until consultation with Doctor Keith, which was nearly six months after the accident, tended to show that appellant had properly set the finger and had treated it with ordinary care and skill. The theory of appellant, in support of which medical testimony was given, was that when the joint was dislocated the nerves around the joint were injured and their function impaired so that nutrition was shut off and atrophy followed. The contention is that the neuritis was not due to the treatment which was given her, but to the original injury, and that, because of her physical condition and her impatience and failure to take care of the finger, a cure was not readily effected. However, as has been already stated, the expert testimony of Keith and Amis and the nonexpert testimony that the finger was crooked and the hand deformed from the time it was

Sly v. Powell.

set by appellant until Keith broke and reset it, and
that there was no change in its condition during that
period, is sufficient to resist the appellant's demurrer
to the evidence.

A number of objections to testimony were made and
have been presented for review, and, in view of the
weakness of the evidence supporting the averments of
appellee, some of the objections discussed can not be
regarded as immaterial.   Several of the nonexpert witnesses
were allowed to repeat statements made by Mrs.
Sly weeks after the injury, and even while she was at
work, that she had suffered and was suffering great
pain and could not use the finger at all.   Testimony as
to expressions of a natural and spontaneous character,
indicating present bodily pain, is competent as original
evidence, but the declarations of an injured party as
to his past feelings and suffering, or which are not
voluntary exclamations of existing pain and suffering,
are mere hearsay and should be rejected.   (*Betterment
Co. v. Reeves,* 77 Kan. 111, 93 Pac. 627; *Railroad Co. v.
Chaney,* 77 Kan. 276, 94 Pac. 126.)   It is manifest that
some of the statements were hearsay, of a self-serving
nature, and were inadmissible.   This testimony may
not have been vitally erroneous, as the trial court recognized
that some of it trenched upon the rule stated,
and instructed the jury that "if there have been any
deliberate statements of plaintiff as to whether she was
suffering pain or not, other than mere spontaneous
exclamations or expressions, then you should not consider
any such evidence in your deliberations in the jury
room."   Whether the effect of the incompetent testimony
was removed by the instructions may be a matter
of doubt.

Another witness was permitted to testify, over objection,
that Mrs. Sly suffered intense pain all the
time.   The testimony was not as to the manifestations
of suffering, but the answer was just a naked conclusion
that the pain was intense.   One witness, who was

not an expert, was allowed to say that the patient's hand was a very sick member, that it was in bad condition, that the joint looked to be out of place, as it had all the time. In effect, her testimony was that the finger was out of joint and had not been properly set by appellant. Nonexpert witnesses could testify as to external appearances and manifest conditions observable by any one, but whether a surgical operation has been performed with a reasonable degree of skill, learning and care, such as is ordinarily possessed and exercised by surgeons and physicians in the treatment of their patients, is a question of science, and is to be established by the testimony of surgeons and physicians having special skill and knowledge, and not by unskilled witnesses who are without training or knowledge as to the injuries sustained or the art of treating them. (*Erastus Tefft v. Hardin H. Wilcox*, 6 Kan. 46; *Pettigrew v. Lewis*, 46 Kan. 78, 26 Pac. 458.) In the last case cited it was said:

"Cases may arise where there is such gross negligence and want of skill in performing an operation as to dispense with the testimony of professional witnesses, but not so in the present case." (p. 81.)

It may be said here that, while some palpable conditions may be understood and stated by a layman, the questions whether there was a fracture of the bone, or whether the articular surfaces of the joint were normal, or whether a nerve had been pinched between the broken surfaces, and whether, in the condition of the finger, appellant had given the patient skillful and proper treatment, should not be determined on the testimony of unskilled witnesses.

There is good reason to complain of that part of the testimony of Mrs. Sly in which she undertook to repeat certain statements that Doctor Hammond is said to have made to her when she consulted him. She had referred to the fact that she had consulted Doctor Hammond, and had been cross-examined concerning that visit and

asked if he did not say different things to her. Then she was allowed to testify on the redirect that when Doctor Hammond examined her hand he said:

"'You have got a bad hand.' He said, 'This knuckle is out of place.' He said, 'It is necessary to rebreak this over and reset it.' He said, 'Anyway,' he said, 'it is too late to do anything for this finger though'; he said, 'The finger is about near gone', only he used the words in medical terms that I did n't know or understand, but I will explain it as near as I can. He said, 'It is out of place, and it is holding the muscles and nerves down there wrong, and that stops the circulation.' He said, 'The nerves in the finger here are in bad shape,' and he says, 'The rest of the hand here is in very bad shape. It has stopped the circulation through the hand, but to rebreak this and reset this will help the rest of your hand,' and he said, 'The sooner you have it done the better for you, for it is only a matter of a few weeks until you will not have much use of your hand, and in time,' he said, 'this finger here will shrivel away, until it won't be half the size it is'; then he used the terms that they use in the medical works about how this was located, and holding the nerves and muscles wrong and causing this trouble, and said that no medicine or any medical treatment I could use would ever even ease the pain, 'because,' he says, 'it can't ease the pain until it is pulled loose to relieve the cause there.'"

There was nothing in the previous examination of the witness that warranted the reception of this testimony. It purports to be the statements of an expert, and it bears directly on the condition of the hand, the effect of appellant's treatment of it, and on the charge of negligent treatment made against him. A physician can not be convicted of malpractice on hearsay evidence or on the testimony of what some one else has said about an injury and of the doctor's treatment of it. Hammond was not a party to the litigation and was in no way connected with appellant or his treatment of Mrs. Sly. This hearsay testimony was important, and necessarily would have much weight with the jury. When it was received no expert evidence had been given

to support the claims of appellee. By this means appellee undertook to strengthen a weak place in her testimony by placing before the jury the opinion of an expert that the dislocation had not been properly reduced by appellant, that the hand had not been properly treated, and, as a consequence, that the nerves of the hand were in bad shape, stopping the circulation, and that it would be necessary to break the finger and reset the joint. If this practice were permissible it would only be necessary for a patient, in order to make out a case of malpractice, to procure an examination by several physicians, and then repeat the statements and declarations which they made to him. It is safer to call the experts themselves as witnesses, and thus obtain their opinions at first hand, under the sanction of an oath, and at the same time afford the adverse party an opportunity to cross-examine them. In order to meet the incompetent testimony that had been introduced, appellant was forced to call Hammond as a witness, and his testimony was that only a partial examination had been made, and that he found the joint swollen, but that there was no dislocation. He advised her to return and he would place her under an anæsthetic, and he would then be able to make a more thorough examination, and, if it was found necessary, he would break up the adhesions. She did not come back for further examination. The error of admitting the hearsay testimony of Hammond's declarations was then emphasized by putting on the witness stand two young women who accompanied Mrs. Sly when she consulted Doctor Hammond, and who practically reiterated the testimony given by her in respect to the statements Hammond is said to have made. The declarations so brought before the jury do not fall within any of the exceptions to the hearsay rule, and their admission is deemed to be prejudicial error.

There are criticisms of the charge of the court, but it appears to be a fair presentation of the rules of law

Sly v. Powell.

applicable to the case, with the exception of a part of instruction ten, in which the jury were told that "a physician or surgeon who holds himself out to the world as an expert in any of the branches of medicine or surgery is required to possess and exercise a higher degree of knowledge and skill than an ordinary practitioner." Nothing is found in the record indicating that appellant held himself out as a specialist in any branch of medicine and surgery. There are those who specialize and give their time and thought to a limited field and who become thoroughly educated and exceedingly expert in their specialty. It may be that they can be held to a higher degree of skill and care; that is, to have and exercise the degree of skill and knowledge possessed by physicians and surgeons who devote special attention and study to particular organs and parts of the body and to the treatment of them. However that may be, there was no basis in this case for holding the appellant to a higher degree of skill and care than is ordinarily possessed and exercised by members of his profession. The correct rule was given in other instructions, where the jury were advised that:

"A physician is required to possess a reasonable degree of learning and skill only; he is required to exercise ordinary care and diligence in the treatment of a patient, and is not responsible for errors of judgment in matters of reasonable doubt. He does not insure a cure, and in the case of a dislocated finger, the fact that the finger does not do well under this treatment does not of itself alone show negligence on the part of the physician. All he is required to do is to use ordinary care and diligence in the treatment of the patient. . . . A physician or surgeon is only required to apply correctly in his practice, methods which are well understood and settled in his profession, and if there are different methods of treatment recognized by the profession he is only required to use his best judgment, under all of the facts and circumstances, as to the method of treatment that should be used in any particular case."

These rules are applicable to the case and correctly

measured the degree of skill and care required of appellant, but the suggestion in the tenth instruction of a different and higher degree of knowledge and skill was inapt and erroneous.

For the errors mentioned, the judgment is reversed and the cause remanded for a new trial.